■ FRANK A. DURSO et al., Respondents, v CITY OF NEW YORK, Appellant. — Judgment of the Supreme Court, Bronx County (John H. Pennock, J.), entered June 11, 1981, modified, on the law and the facts, to the extent of reversing the judgment in favor of plaintiffs and a new trial ordered solely on the issue of damages unless plaintiffs Frank A. Durso and Catherine Durso, within 20 days after service upon them of a copy of the order herein, with notice of entry, serve and file in the office of the clerk of the trial court, a written stipulation consenting to reduce the verdict in favor of Frank A. Durso to the sum of $450,000 and the verdict in favor of plaintiff Catherine Durso to the amount of $50,000 and to the entry of an amended judgment in accordance therewith, without costs or disbursements. If the plaintiffs so stipulate, the judgment, as so amended and reduced, is affirmed, without costs and without disbursements. After review of the record, the damages appear to us to be excessive to the extent indicated. Concur — Carro, J. P., Silverman and Bloom JJ.; Fein, J., concurs in a memorandum and Kassal, J. dissents in part and concurs in part in a separate memorandum:

Fein, J. (concurring). On September 6, 1975, Frank Durso (Frank), while driving his automobile, was stopped for a red light when his car was hit in the rear by a New York City Sanitation Department truck. The impact pushed Frank's automobile 10 to 20 feet into the intersection, causing so much damage to the automobile as to require that it be junked. Frank, who refused immediate medical attention at the scene, went to the nearby offices of his medical doctor, complaining of excruciating pain. The doctor recommended bed rest and aspirin. By the following Monday, September 12, 1975, when the pain failed to subside, Frank visited Dr. Gary Gallo, an orthopedist who had previously treated him for a back sprain in June, 1975. He had also suffered a back sprain in 1970. Following the September 6, 1975 accident with the sanitation truck, Frank complained to Dr. Gallo of a "toothache-like" pain that ran down from his spine to his buttocks. Dr. Gallo conducted several tests which indicated a back condition which had not appeared when these same tests were given for the prior two incidents. Frank saw Dr. Gallo on a regular basis, and as early as September 26 (20 days after the accident) Dr. Gallo diagnosed a protruding (herniated) disc. Frank obtained some relief and was able to return to work within seven weeks after the accident. He was required

to wear an elastic belt. He was placed on light duty and only assigned as a letter carrier at Christmas time that year. This assignment did not last very long, and Frank was frequently required to have assistance and given intermittent light duty. The "toothache-like" pain continued. Dr. Gallo indicated surgery might be necessary. In 1976 there was some temporary improvement. However, in early 1977 the pain increased and was "frequent or worse than it had been". Frank was seeing Dr. Gallo every eight weeks. Prior to May, 1977 and again several times thereafter surgery was discussed. By September Frank could barely lift his leg, there was great pain and surgery was again discussed. On January 23, 1978 an incident occurred which the city later described as "significant" and the dissent refers to as "critical". On that date, Frank and 8 to 10 fellow employees were pushing a small empty mail truck out of the snow when he sustained another back injury, which Dr. Gallo testified merely aggravated his existing condition, which Dr. Gallo had diagnosed as a herniated disc. Frank was bedridden and on anti-inflammatory and pain-relieving drugs until March 8, 1978, when he was admitted to the hospital for a myelogram and a presurgical workup and where he was put in traction for three weeks. The diagnosis of herniation was confirmed. Plaintiff was in constant, serious back pain. It was determined that surgery was required. On April 1, 1978 Frank was discharged and given medication to ease the pain. Hopefully, conservative treatment would succeed. However, it was not to be. Frank was readmitted to the hospital on June 30, 1978 and remained there for 14 days, during which time surgery was performed, two spinal discs were removed and a fusion of his back was performed. He was in constant pain after the surgery. After discharge, he was fitted with a back brace. However, he had to remain in bed for the entire summer of 1978. Although his condition improved temporarily, it then worsened because the fusion did not take. At the time of trial the weakness in Frank's left leg continued and he was suffering from pain which he described as at the same level as prior to the surgery. Dr. Gallo, plaintiffs' medical expert, testified that the condition was permanent and that it was very likely that additional surgery would be required. He further testified that the competent producing cause of the herniated discs was the automobile accident involving the city's sanitation truck. He further testified that during treatment of plaintiff it was discovered that he suffered from a congenital disease called "stenosis", a narrowing of the root canals in the back. Both Dr. Gallo and Dr. Jonathan Korn (the city's expert) stated that this condition is not produced by trauma. Dr. Gallo maintained throughout his testimony that the proximate cause of Frank's back problem, the herniated discs, was the September, 1975 accident. Dr. Korn, who did not examine Frank, testified after reviewing Frank's medical history. It was his opinion that the stenosis was the cause of the pain to plaintiff's back and legs, although he conceded the obvious — that Frank had herniated discs which were undoubtedly caused by trauma and that such an injury was disabling and would cause severe pain and great suffering. Strangely enough, on direct examination, Dr. Korn, called as defendant's expert, was never asked whether, in his opinion, the September, 1975 sanitation truck accident caused the herniation or whether plaintiff's pain, disability and discomfort were due to stenosis rather than the herniated disc. Only on redirect did he testify in answer to a hypothetical question — that if a person suffered from a herniated disc, such as Frank was alleged to have sustained, it would be next to impossible for him to have continued working for two years without losing days from work. It is this answer which the dissent asserts was unequivocal testimony that the cause of the 1975 back injury was not the accident but Frank's stenosis (his pre-existing congenital back condition). How the congenital stenosis could have been the cause of the back injury produced by the rear-end collision is not explained. The plain fact in the record

is that Dr. Korn was never asked what caused the herniated discs or whether the 1975 accident and the herniated discs were causally related. The trial court properly told the jury that the only expert witness testifying as to the cause of the herniated discs was plaintiff's doctor, Dr. Gallo. The dissent seems to suggest that the pain and suffering sustained by Frank was occasioned by the congenital stenosis and to discount almost completely the herniated discs found by Frank's doctor, which defendant's expert necessarily conceded were present. It was undisputed that a herniated disc is occasioned by trauma and stenosis is not, and that Frank's pain and suffering was attributable to the herniated discs, albeit Dr. Korn asserted that stenosis caused pain. It is asserted in the dissent that the trial court did not seek to differentiate between the stenosis and the herniation and the causation of each. However the charge stated as follows: "In other words, the accident that you have heard described here where the truck hit the rear of the car and pushed it forward, you must find — if you find for the plaintiff that the injuries that he claims to have sustained or proximately caused by that occurrence" and further "Now, that is only my recollection of his testimony and it is important for you to take your recollection and it is your recollection that must govern here and not mine, but you do have an issue on the medical in this case and if you find that the plaintiff's injuries to his back were in no way connected to the accident in 1975 with the City truck, then the plaintiff cannot recover at your hands. If you find that the truck injury was a concurrent proximate cause, in other words, that he did sustain injury that weakened the disc or weakened the back and then later on, January 26th in 1978 when he was pushing the jeep out of the snow, that if you find that that was an aggravation, then you can find for the plaintiff. Now, if you find that before this collision the plaintiff had a condition, a congenital condition to his back and further find that from the collision his condition was aggravated so as to cause suffering and disability, then the plaintiff is entitled to recover for any disability or pain resulting from such aggravation. He is not, however, entitled to recovery from any physical ailment or disability which existed prior to the collision or for any injuries from which he may now be suffering which were not caused or contributed to by this collision. Recovery must be confined to that damage due to the enhancement and aggravation of the pre-existing condition and not the condition itself. In essence, then, the plaintiff should be compensated to the extent that you find he was further disabled by the negligence of the City's truckdriver in the operation of this truck. Now, if you find that the plaintiff had a bodily condition which made him more subject to the injury than a person in normal health, the defendant is nevertheless legally responsible for such injuries if any as to find the plaintiff suffered as a result of the negligence of the defendant even though those injuries due to said condition may have been greater than those which would have been suffered by a normal person under the same circumstances." Although this portion of the charge may not have been couched in the clearest language, it plainly poses the issues in the case, when read in its entirety. The dissent further assigns error to that portion of the charge which stated "there was no proof as to any permanency from the injuries sustained in that accident." However, it does not lie in the mouth of the defendant to complain about this. Plaintiffs' counsel noted this error, but when the court stated that it would be confusing to recharge them on that, plaintiffs' counsel replied "O.K." If this be taken as a correct version of what occurred, it does inure to the benefit of defendant and not to plaintiffs. We deal here with defendant's appeal. There is no appeal by plaintiffs. Moreover, read in context, it is clear that the Trial Judge was telling the jury that if they did not find the disc injury was caused by the accident with the sanitation truck, there was no basis for any claim of permanency. This plainly appears from the court's charge as

follows: "If you find that the plaintiff's injuries were proximately caused by the defendant's negligence as I have directed as a matter of law as to the negligence, now in the issue before you, if you find that his injuries as complained of as to the disc and the operation were not caused by no relationship to the truck accident, then in that event you would only consider his damages from the resulting truck accident itself which was six or seven weeks from work and the pain and suffering that he sustained during that period of time. There was no proof as to any permanency from the injuries sustained in that accident so that you can still find a verdict for the plaintiff, but based only on the damages as a result of that accident." The dissent appears to overlook the context. The dissent emphasizes the reference to the defendant's medical expert as a "paid witness". When defense counsel took exception, the court suggested a correction. The defense counsel declined. Read in context, it is clear that the court was properly distinguishing plaintiff's medical witness, who was the doctor who treated plaintiff throughout and who performed the operation. It is obvious he stood in a different category than the defendant's expert, who merely examined the records made by Frank's doctor and never examined the patient. Plainly there is a difference between a treating physician who also testifies as an expert — albeit he is paid for going to court — and an expert who testifies upon the basis of an examination of the records. The court quite properly noted the distinction. In this case, defendant failed to call its examining physician and relied solely on the expert. Whatever the reason, we should not now indulge defendant and afford it another opportunity to choose its expert, since the only issue in the case is one of damages. Next, the dissent faults the charge for failure to use the language of New York Pattern Jury Instructions with reference to the subsequent accident and suggests that the court did not instruct the jury in regard to a subsequent injury or accident in PJI 2:306 terms. The dissent appears to disregard that portion of the charge in which the court stated: "Now, if you find that subsequent to an original injury caused by the defendant City's negligence and while the plaintiff was proceeding, in other words, with his physician's instructions and in a reasonably careful manner in getting about, plaintiff was involved in a second accident, that was the accident where he was pushing the vehicle after work, the Post Office vehicle, the plaintiff is entitled to recover from the defendant if you find from any aggravation of his original injury". Albeit this is not in the language of the Pattern Jury Instructions charge, it states its substance. The dissent goes on to state, "This is especially highlighted by the fact that plaintiff had a fairly good recovery from the accident at issue here, having resumed his regular daily chores as a letter carrier within a few months." We have highlighted some of Frank's problems in the years after the subject accident. This record of pain and suffering does not seem to demonstrate "a fairly good recovery". In any event, the issue was for the jury. The dissent faults the Trial Judge for quoting Frank's testimony that his back hurt "like a toothache", in commenting on the testimony concerning the marital relations between Frank and Catherine. The dissent emphasizes the wife's testimony that they had resumed sexual relations two and one-half months after the September, 1975 accident. However she also testified as follows: "Q: Mrs. Durso, with regard to your marital life, what effect if any has this, has this injury had upon your marital life? A: Not as often as it used to be, not as often. I'd rather not talk about it, please." The husband's testimony, with respect to the same subject, reads as follows: "Q: Now, sir, after this truck accident when you were hit, can you tell us how your injury, the injuries that you sustained after that, the trouble that you had with your back has affected your marital life over these years? A: Yes sir. It decreased quite badly after the incident of 1975 in September. It got worse. Q: What got worse. A: My — how can I put it? Sexual

relations with my wife * * * Q: What do you feel with regard to pain when you engage in such activity? A: It is more severe, it hurts, and I get that feeling like a toothache numbness feeling from the spine into the hip down the leg." It was not error for the charge to refer to this testimony. The dissent several times makes the point that the court did not refer to Frank's return to his job on a regular basis after the accident in September, 1975. The record is replete with evidence that Frank had problems with his back after the September, 1975 accident, was intermittently on light duty, and at other times had to have assistance, was almost always in pain and wore an elastic belt. The charge made clear that Frank had returned to work. This was so undisputed as to need no comment. The jury could not have been misled. The questions in this case related to damages, plainly jury questions. The charge was not a model. Few are. Perfection does not reside in the Pattern Jury Instructions either. The charge adequately dealt with the relevant issues. Even if the version of the charge rendered in the dissent was all that there was to it, no ground for a retrial exists. Plainly the defendant seeks a retrial to afford it an opportunity to try a new strategy, perhaps to call its examining physician, or to use another expert or to try the case without an expert. On the basis of this record there is no warrant for such relief. In my view the record amply justifies the amount of damages awarded to Frank. I agree that the damages awarded to Catherine Durso are excessive. However, I concur in result as to both, solely to afford the plaintiffs an opportunity to accept the proposed reductions in the verdict.

Kassal, J. (dissenting in part, concurring in part). The jury's verdict in the amount of $700,000 in favor of the injured plaintiff, Frank Durso, and in the amount of $300,000, for his wife, Catherine Durso, for her derivative cause of action for loss of services, should be set aside and a new trial ordered as a result of (1) the court's improper instructions to the jury; (2) the unbalanced marshaling of the evidence in the court's charge; and (3) because the said verdicts are grossly excessive. Plaintiff suffered from a chronic back condition, both prior and subsequent to the September 6, 1975 accident, the subject of this action. It is undisputed that plaintiff had stenosis, a congenital back condition, which is a narrowing of the root canals. In addition, there were four separate instances, in the course of a relatively short period of time, when plaintiff sustained traumatic injuries to the back. The first occurred in 1970, when plaintiff, a letter carrier with the post office, strained his back and was out of work for a week or two. The second was in June, 1975 when, on reaching for a package in a mailbox, he felt another strain or pull. Again, he was out of work for a week or two. Three months later, a third trauma took place, the claimed basis for the damages sought herein. This occurred, on Saturday, September 6, 1975, while plaintiff was driving his own vehicle and was hit in the rear by defendant's sanitation truck. There is no dispute as to liability. Plaintiff was out of work for seven weeks and returned to limited duty on October 25, 1975. Thereafter, plaintiff resumed his duties as a letter carrier which included driving, loading and unloading a mail truck. More than two years later, the fourth and last trauma occurred on January 23, 1978, when plaintiff volunteered to "get the truck out of the way". He joined eight or so other coemployees in dislodging a United States mail collection truck, which had become stuck in snow and ice. While rocking the vehicle back and forth, it slid backwards, whereupon plaintiff felt a strain in his back. He worked the balance of that day and the next day. On the third day after the incident, his condition worsened and he saw a doctor who advised him to go home and directed him to remain in bed. The condition, however, continued. Two months later, plaintiff was admitted to the Greenwich Hospital for treatment of the back condition in March, 1978 and remained there for a month, having been placed in traction for three weeks. A lumbar myelogram fortified the diagnosis of a herniated disc at the

fourth and fifth lumbar vertebrae. He was readmitted to the Greenwich Hospital on June 1, 1978, where a partial laminectomy was performed for removal of the discs at the L 3-4 and L 4-5 levels, in addition to a hemilaminectomy, to widen the nerve root opening at L-5. At that time, plaintiff's orthopedist noted the presence of stenosis which was congenital and not induced by trauma. Upon his discharge on April 1, 1978, plaintiff was fitted with a brace to stabilize the back. Following the January, 1978 accident, plaintiff never returned to his employment as a letter carrier. His condition, it is alleged, further deteriorated until he was placed on the disabled list at the post office and was retired for accident disability as a result of the January, 1978 line-of-duty incident. Dr. Gallo, plaintiff's treating orthopedist, testified that he had diagnosed a herniated disc in September, 1975, in relation to the second trauma. Although at trial he opined that the herniated disc was causally related to the September, 1975 accident, he admitted that plaintiff did not display any symptoms of a herniation prior to the January, 1978 line-of-duty accident. Moreover, in March, 1978, Dr. Gallo had given his opinion that plaintiff's disability occurred in the course of his employment by reason of a herniated disc resulting from the January, 1978 service-connected incident, two years and four months after the September, 1975 injury. Thus, with a long-standing history of degenerative stenosis, unrelated to any trauma, and four accidents, one in 1970, two in 1975 and one in 1978, the jury required careful instructions in determining those injuries that flowed from the September, 1975 trauma, for which the defendant was to be held responsible. However, in marshaling the evidence as to the cogent medical testimony critical portions of the plaintiff's medical expert's testimony were omitted. Such portions were not only significant but also led to confusion on the part of the jury in applying the applicable law. To illustrate: (1) After stating that the stenosis was degenerative in origin and not traumatic, the doctor conceded that there was "stenosis of the root canals, L-4, 5 and L-5, S-1" and that in June, 1975, he had diagnosed plaintiff as having a degenerative disc disease at the L-4, L-5 level. He then indicated that a herniated disc is "usually shown by a bulging" and his records after the 1978 incident only showed a bulging at the L-4 level and not L-4, L-5 and that "there was a stenosis of the L-4, L-5 and L-5, S-1"; (2) He acknowledged that stenosis will produce problems in more than one disc — "a narrowing of the root canals at more than one location" and there was a narrowing of L-2, L-3, L-3, L-4, L-5 and S-1; (3) When questioned about his testimony on direct as to a herniated disc (as distinguished from stenosis) at the L-4, L-5 level, he stated that the absence of a knee-jerk reflex and the presence of some atrophy in the leg would be some evidence of a herniated disc. He then admitted that "prior to the accident of January, 1978", he found no absence of knee-jerk reflex and no atrophy present, although he had previously testified that he had diagnosed herniated discs at the L-4, L-5, as a result of the September, 1975 accident; (4) His answers on cross-examination established that after this September, 1975 accident, the plaintiff had a schedule of running and swimming exercises, as well as deep-knee bends and touching his toes, which schedule was maintained until the accident of January, 1978, plaintiff returned to work seven weeks after the September, 1975 accident and continued to work throughout 1975, 1976 and 1978 up until the 1978 accident, after which "he was confined, if you will, to bed rest, basically"; (5) Dr. Gallo conceded he "told the United States Government at that time, 1978, that the herniated disc suffered by Mr. Durso came about by reason of the injury he sustained on the job in January of 1978 and his office wrote a letter stating "that the ruptured disc came about from a work injury"; (6) Plaintiff's injuries were claimed to be permanent; he offered proof to support the claim. Nevertheless, the court instructed the jury "there was no proof of permanency".

Plaintiff's attorney objected before the jury began their deliberations. Nevertheless, the trial court, while acknowledging the error, gave no curative instruction, stating: "I see what you mean, but it would be confusing, I think to the jury to recharge them on that" to which plaintiff's counsel responded "Okay"; (7) In the same vein, there was another instance of counsel's concern about the court recharging the jury when there was obvious confusion. When defense counsel took exception to the fact that only the defendant's medical expert was referred to as a "paid witness", the court suggested the substitution of the word "compensated" for "paid" as being curative. Counsel, still unsatisfied, was unwilling to have the court give further instructions because it would only re-enforce the issue. The court agreed. I find the court's instructions on the issue of aggravation both confusing and palpably insufficient. New York Pattern Jury Instructions deals with the areas of "Aggravation of Pre-existing Injury" in PJI 2:282 and "Subsequent Injury — Subsequent Accident" in PJI 2:306. The trial court did charge, in substance, in accordance with PJI 2:282 as to the prior accidents and condition but wholly failed to instruct the jurors in regard to a subsequent injury or accident (PJI 2:306), which was crucial for a fair evaluation of the impact of the January, 1978 accident. This omission was prejudicial in removing from the jury's consideration the issue as to the injuries for which the defendant was responsible. The omitted portion reads as follows: "However, *if the second accident was caused by the negligence of plaintiff* in (getting about, failing to follow his physician's instructions) *the defendant cannot be held responsible for the* aggravation of the injury originally sustained or for any additional injury caused by such second accident." (Emphasis added.) On this record, plaintiff's voluntary actions in the January, 1978 accident may have constituted negligence in that, although he claims a pre-existing back condition, nevertheless, he voluntarily chose to assist in pushing a mail truck. Taking cognizance of an undisputed history of four separate accidents and a congenital condition of stenosis, the omitted passage takes on added significance. This is especially highlighted by the fact that plaintiff had a fairly good recovery from the accident at issue here, having resumed his regular daily chores as a letter carrier within a few months. In marshaling the evidence, the court did not present an objective and balanced presentation of the evidence. (*Blaize v City of New York,* 80 AD2d 594, 595; *Gilhooly v Piciocchi,* 45 AD2d 961; *Kissner v Baxter,* 29 AD2d 905.) Undue emphasis was placed on facts favorable to the plaintiffs. In effect, the marshaling was more in the nature of a summation, presenting to the jury the trial court's subjective evaluation of the evidence, almost as if they were findings of fact. Some illustrations of the presentation will demonstrate the inherent lack of balance: (1) The court referred to Dr. Korn, the defendant's medical expert, as the defendant's "paid witness" and did not do so in connection with Dr. Gallo, the plaintiff's doctor, who obviously had been similarly paid to testify. (2) Dr. Korn had unequivocally testified that, in his medical opinion, the cause of the September, 1975 back injury was not the accident but was plaintiff's stenosis, his pre-existing congenital back condition. Nevertheless, the trial court told the jury that the only expert witness testifying as to the cause of the accident was Dr. Gallo, plaintiff's doctor. (3) On three occasions, the court stated that Dr. Korn's testimony was based solely upon the records, not upon examination, as contrasted with plaintiff's treating doctor. Although accurate, the defendant, at its option, employing the strategy it deemed to be most appropriate, had various trial options: (a) present no expert witness since plaintiff had the burden to prove his case; (b) present an examining doctor; or (c) present a nonexamining doctor. Although Dr. Korn had not examined the plaintiff, this is not an uncommon practice in negligence litigation. This did not warrant the court repeatedly and adversely commenting upon his testi-

mony. Clearly, such comments could properly be included in counsel's summation, but repetition by the court that Dr. Korn had never actually examined plaintiff while Dr. Gallo was the treating physician went beyond objective and balanced marshaling. (4) Plaintiff testified that the back condition hurt "like a toothache". Again, although a proper subject for summation, the court overemphasized this testimony by repeating it three times. (5) Plaintiff's wife testified that her sexual relationship had been interrupted for a short period but the trial court referred to it as if it were a permanent interruption. Thus, the court stated "that as a result of the accident, their personal, social and their family life in their home has deteriorated." In her cross-examination, plaintiff's wife admitted that they had resumed sexual relations two and one-half months after the September, 1975 accident. After reminding the jurors that "his affection, love and sexual intercourse" were an element of her damages, the court, in this context, commented that his back was "like a toothache at times". (6) In its factual narration, the court did not refer to plaintiff's return to his job on a regular basis after the accident in September, 1975 and before the 1978 accident. The foregoing are some instances of the lack of fairness and balance and the confusion which permeated the court's marshaling and charge to the jury. In light of the long-standing back problems and the several traumas, the critical issue of causation here required careful instructions, with an emphasis on clarity and accuracy to avoid any indication that the Trial Justice had an opinion as to the facts or the credibility of the witnesses. (See *Theodoropoulos v New York City Health & Hosps. Corp.*, 90 AD2d 792.) The instructions here did not meet this standard, necessary to ensure a fair and impartial verdict. In addition, both counsel were similarly confused at different stages. Thus, the Trial Justice referred to the fact that there was no "proof or permanency from the first accident [the one at issue]", to which the attorney for plaintiff objected. The court's response was: "I see what you mean, but it would be confusing, I think, to the jury to recharge them on that." Plaintiffs' counsel agreed. Aside from the foregoing, we find an award of $700,000 to the plaintiff and $300,000 to plaintiff's wife to be so excessive that we join with the majority in concluding that the award shocks the conscience of the court. Contrary to the position taken by our colleagues, however, we conclude that the unbalanced and highly confusing nature of the court's charge impinged upon the rights of the defendant to such a degree as to deprive the city of its right to a fair and impartial trial. The plaintiffs had resumed an almost normal life, prior to the fourth accident, and to the extent that he volunteered to push the truck, his actions were either negligence, or, at the least, unwise. It was at that point that his real difficulties began. This alternative, however, was not adequately or fairly posed for the jury's consideration and evaluation. Accordingly, we would reverse the judgment, set aside the verdict and remand the case for a new trial on damages only.